UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------X
GSR MARKETS, LTD. and PAUL ROGERS

                              Plaintiffs,                    20 Civ. 440

      -against-

FR8 NETWORK INC.,
MAXIMALIST MEDIA LLC d/b/a
MAXIMALIST VENTURES,
JONATHAN FOX and
SLOANE BRAKEVILLE,

**COMPLAINT**

**Jury Trial Demanded**

                              Defendant.
---------------------------------------------------------------X

      Plaintiffs GSR Markets, Ltd. ("GSR") and Paul Rogers ("Rogers") (collectively, the "Plaintiffs"), by and through their attorneys, The Roth Law Firm PLLC, hereby submit this Complaint against Defendant Fr8 Network Inc. ("Fr8"), Maximalist Media LLC d/b/a Maximalist Ventures ("Maximalist"), Jonathan Fox ("Fox") and Sloan Brakeville ("Brakeville") collectively the "Defendants"), as follows:

## PARTIES

      1.     Plaintiff GSR Markets, Ltd. is a foreign limited company with a principal place of business located in Hong Kong.

      2.     Plaintiff Paul Rogers is an individual residing in Singapore.

      3.     Upon information and belief, Defendant Fr8 Network Inc. is a Delaware corporation with a principal place of business in California, that maintains a business office in New York City and is registered with the New York State Department of State to do business in New York (DOS ID# 5294107).

4.	Upon information and belief, Defendant Maximalist Media LLC d/b/a Maximalist Ventures is a domestic limited liability company existing and operating under the laws of the State of New York with a principal place of business in New York City and is registered with the New York State Department of State to do business in New York (DOS ID# 5419397).

5.	Upon information and belief, Jonathan Fox is an individual residing in the State of New York, is the co-founder and former CEO of Fr8 and a current founding member of Maximalist.

6.	Upon information and belief, Sloan Brakeville is an individual residing in the State of California and is the co-founder and current CEO of Fr8.  Upon information and belief, Brakeville does business in New York.

## JURISDICTION AND VENUE

7.	This action arises under, among other things, Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 thereunder ("Section 10(b)").  Plaintiffs seek to recover damages Plaintiffs sustained as a result of the Defendants' conduct, the costs of this suit, interest, and reasonable attorneys' fees. The court's jurisdiction is invoked under 28 U.S.C.A. §§ 1331, 1332, and 1337; 18 U.S.C.A. §§ 1964(a) and 1964(c).

8.	Venue is proper in this district as a substantial part of the events or omissions giving rise to the claim occurred in New York City, each of the Defendants do business in New York City, Defendants transacted business in New York City in connection with the facts underlying this case, and Fr8 maintains an office in New York City.

## STATUTORY FRAMEWORK
## AND GENERAL APPLICATION TO DIGITAL TOKENS

9. Section 10(b) makes it unlawful to "use or employ, in connection with the purchase or sale of any security" a "manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe." 15 U.S.C. § 78j(b).

10. "Security" is defined broadly to include, among other things, stocks, bonds, debentures, a variety of other instruments including investment contracts, or, "in general, any instrument commonly known as a 'security.'" 15 U.S.C. § 78c(a)(10).

11. "Investment contracts" are instruments through which an individual invests money in a common enterprise and reasonably expects profits or returns derived from the entrepreneurial or managerial efforts of others. In a variety of circumstances, courts have found that novel or unique investment vehicles constitute investment contracts, including enterprises existing only on the Internet. As the U.S. Supreme Court has noted, Congress defined "security" broadly to embody a "flexible rather than a static principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits."

12. The term "digital asset" or "digital token" generally refers to an asset that is issued and transferred using distributed ledger or blockchain technology, including, but not limited to, so-called "cryptocurrencies," "coins," and "tokens." Entities have offered and sold digital tokens in fundraising events, often called "Initial Coin Offerings" or "ICOs," in exchange for consideration.

13. Issuers of digital tokens typically release a "whitepaper" or marketing materials describing the project and the terms of the issuance. To participate, investors typically transfer funds to the issuer's accounts. After the completion of the issuance, the issuer will deliver its

3

unique token to the participant's unique address on a distributed ledger or blockchain. A blockchain or distributed ledger is a peer-to-peer database spread across a network, that records all transactions in theoretically unchangeable, digitally recorded data packages.

14. On July 25, 2017, the SEC issued what is often called the "DAO Report," advising "those who would use … distributed ledger or blockchain-enabled means for capital raising, to take appropriate steps to ensure compliance with the U.S. federal securities laws," and finding that the offering of digital assets at issue in that report were investment contracts.

## FACTS

15. GSR is a global cryptocurrency market-maker and liquidity-providing company.

16. On or about January 18, 2018, Fr8's Chief Executive Officer, Jon Fox, informed Plaintiffs that Fr8 was close to bringing its utility token and proprietary platform ("Fr8 Board") to market, and referred Plaintiffs to Fr8's distributed whitepapers existing at that time (the "January 2018 Whitepapers").

17. Fox and Brakeville were authors of the January 2018 Whitepapers.

18. Fr8's purpose, according to the January 2018 Whitepapers, was to bridge the inefficiencies of the trucking industry (including carriers, suppliers and the brokers between them) by utilizing technology to allow the sharing of information between its different participants. Contracts, shipment tracking, payment, user ratings and other key trucking transactions would occur on Fr8's proprietary marketplace (known in its basic form as "Fr8 Board").

19. According to the January 2018 Whitepapers, Fr8 utility tokens are used to "power[] all Fr8 Board transactions, act[] as credit escrow, and enable[] instant settlement."

4

20. In addition to the transactional platform itself, according to the January 2018 Whitepapers, "Fr8 will offer a range of complementary products and services, from software solutions and financial services, to loyalty programs providing discounted rates on business staples (e.g. fuel, accommodations, and insurance)."

21. The January 2018 Whitepapers provided information regarding the value of the Fr8 tokens. Therein, Fr8 represented that the "price per token" is $0.15.

22. The January 2018 Whitepapers further represented that the "use of funds" in connection with its sale of Fr8 tokens would be allocated as follows: R&D 50%; Adoption Incentives 25%; Marketing & Partnerships 15%; Token Launch 5%; and Legal 5%.

23. The January 2018 Whitepapers indicated that its "core team" consisted of eight (8) individuals (including Jon Fox and Sloane Brakeville, Fr8's "co-founders") and Fr8's "advisors" consisted of an additional eighteen (18) individuals.

24. Upon information and belief, the eighteen "advisors" listed in the January 2018 Whitepaper were included in the January 2018 Whitepaper solely to create a false sense of legitimacy in Fr8's business for the purpose of luring investors, as the vast majority of them became unassociated with the company at close of the ICO.

25. Similarly, while Fox was listed in the January 2018 Whitepapers as Fr8's co-founder and CEO, immediately after the fraudulent ICO was complete (*i.e.*, as soon as he had to actually start building and running a legitimate business), Fox switched to being an "advisor" and subsequently left Fr8 altogether. Brakeville took over as CEO once Fox resigned, which was mutually beneficial and, upon information and belief, part of Fox and Brakeville's fraudulent scheme all along. That is, Fox absolves himself for Fr8's failures to actually become

a functioning business and Sloane gets to blame "past leadership" for the business' current failures.

26. Because, according to the January 2018 Whitepapers, "[t]he Fr8 token is an ERC20-compliant token generated on the Ethereum blockchain specifically for use in the Fr8 ecosystem[,]" investments in Fr8 tokens were required to be made through the Ethereum blockchain ("ETH").

27. In reliance on the representations stated in the January 2018 Whitepapers and Fox's representation that Fr8 was close to bringing its utility token and proprietary platform to market, on February 4, 2018, Plaintiffs' broker and agent, purchased Fr8's utility tokens as part of Fr8's ICO, in an amount equal to 1,000 ETH (570 ETH were purchased on behalf of GSR, and 430 ETH on behalf of Rogers).

28. On February 4, 2018, on crypto exchange platforms such as Coinbase (a marketplace wherein ETH can be purchased), GSR's 570 ETH was worth approximately US$471,644 and Rogers' 430 ETH was worth approximately US$355,802.

29. Although Fr8 tokens were intended to serve as a form of currency on the Fr8 Board, the tokens cannot as a matter of fact or law be considered currency because the Fr8 Board did not exist at time of investment, nor does it currently operate.

30. Plaintiffs' purchase of Fr8 tokens in February 2018 constitutes an investment contract in a common enterprise from which Plaintiffs expected to profit once the Fr8 Board launched.

31. Notwithstanding Plaintiff's nearly US$830,000 investment in Fr8 tokens in February 2018, Fr8 did not deliver any tokens to Plaintiff at that time.

32. For several months following Plaintiffs' February 2018 investment, Plaintiffs or their agents continuously requested information from Fox and Fr8 regarding when the Fr8 Board would launch.

33. In May 2018, Plaintiffs learned via a public statement made by Brakeville (confirmed in a subsequent whitepaper issued by Fr8 in August 2018) that Fr8's business model had materially changed.

34. That is, when GSR purchased Fr8 tokens in February 2018, Fr8 was touting a product meant to connect shippers, carriers, and brokers on Fr8's proprietary site and within applications where Fr8 tokens could be used as a way to codify and execute transactions (*i.e.*, as a form of currency). By August 2018, however, Fr8 had materially changed its business model from a "utility token" with clear revenue lines to an "open source protocol" whereby users of the Fr8 Board would now earn free tokens simply by using the network.

35. This materially changed business model of offering continuous free Fr8 tokens, is a radical departure from the purely subscription-based model that existed when Plaintiff purchased their Fr8 tokens in February 2018.

36. As stated publicly by Brakeville in May 2018, "50 Fr8 token will get deposited to each new user's address" because "the expectation is that more and more people will get a lot of value out of it, they'll tell their friends."

37. Fr8 charged Plaintiffs approximately US$830,000 for tokens that Fr8 would now be giving away for free to its users.

38. As of the date of this Complaint, Fr8 has failed and refused to deliver to Plaintiffs the tokens that Plaintiffs purchased in February 2018.

39. Upon information and belief, the reason why Fr8 has failed and refused to deliver to Plaintiffs the tokens they purchased, is because the Fr8 Board does not operationally exist, and the tokens are - and have always been - worthless.

40. On or about October 3, 2018, Paul Rogers met Fox at Fox's home in New York City. It was at that meeting that for the first time, Fox informed Rogers that the Fr8 business had failed and that the proceeds of Plaintiffs' investment had been diverted to a new business making promotional videos, which upon information and belief, is Maximalist. Rogers asked Fox whether he had obtained consent from all of Fr8's investors, to which Fox responded that he did not need their consent.

41. Rogers was shocked by Fox's brazen proclamation that he had, without permission from investors, diverted Fr8 investor funds into an entirely unrelated business.

42. Upon information and belief, Maximalist is funded, at least in part, with Plaintiffs' monies.

43. In an attempt to conceal Defendants' unlawful conduct, Brakeville represented to a Telegram account operated by Plaintiffs' forensic investigator: "If Jon [Fox] took investor money and then invested in other ICOs that's not illegal. He was in control of the company."

44. Fox' intention was never to put considerable work into growing Fr8 (as represented in the January 2018 Whitepapers), but was instead intended to raise money based on false and misleading representations and, aided by Brakeville (and possibly others), to line both of their pockets with investor funds by, among other things, using investor funds to start Maximalist (which according to the New York State Department of State website, was formed on October 2, 2018, one day prior to Fox's meeting in New York City with Paul Rogers) and to invest in other ICOs.

45. Defendants used Fr8 investor funds to make investments unrelated to Fr8 and not in conformity with the representations made in the January 2018 Whitepaper with respect to how investor proceeds would be used.

46. Had the material changes to Fr8 Board's protocol been made known to Plaintiffs prior to their investment in February 2018, Plaintiffs would not have purchased any Fr8 tokens.

47. Had Plaintiffs known that the "advisors" listed in the January 2018 Whitepapers were included solely to lend a sense of legitimacy to an otherwise illegitimate business entity that would unlawfully divert investor funds, Plaintiffs would not have purchased any Fr8 tokens.

48. Had Plaintiffs known that their invested funds would be diverted to Maximalist or otherwise used by Defendants to invest in other ICOs, Plaintiffs would not have purchased any Fr8 tokens.

49. Plaintiffs reasonably relied on the representations contained in the January 2018 Whitepapers in deciding to make its investment in Fr8 tokens in February 2018.

50. Upon information and belief, a full accounting of Fr8's business records will reveal an outrageous misuse and diversion of investor funds.  Relevant records to be reviewed include: Fr8 business email accounts, Fr8 team member email accounts, Fr8 exchange accounts, Fr8 team member exchange accounts, personally owned crypto wallets (such as Trezors or software wallets) for all Fr8 team member, business owned crypto wallets (such as Trezors or software wallets), Fr8 bank accounts, Fr8 team member business bank accounts, among other categories of documents and information.

## AS AND FOR A FIRST CAUSE OF ACTION AGAINST
## Fr8, FOX AND BRAKEVILLE
## FOR VIOLATION OF § 10(b) OF THE SECURITIES ACT OF 1934
## AND RULE 10b-5 PROMULGATED THEREUNDER

51.     Plaintiffs repeat and re-allege each of the above paragraphs as if fully set forth herein in their entirety.

52.     The aforementioned material misrepresentations and omissions contained in the January 2018 Whitepapers, on which Plaintiffs relied to their detriment, constitute fraudulent and deceptive acts and practices by Defendants Fr8, Fox and Brakeville, committed knowingly, intentionally and/or grossly negligently and with a deliberate and/or reckless indifference to making an accurate, fair, balanced and non-misleading presentation to Plaintiffs, in violation of §10(b) of the Securities Exchange Act of 1934, 15 U.S.C. §78j(b), and Rule 10b-5 promulgated thereunder.

53.     As a direct result of Defendant Fr8, Fox and Brakeville's securities fraud, Plaintiffs have been injured in an amount to be determined at trial, but believed to be no less than $830,000, exclusive of interest and all attorneys' fees and costs associated in prosecuting this action.  As Defendants' actions were intentional and designed to deceive the Plaintiffs and the public in general, Plaintiffs respectfully request an additional award of $1,000,000 in punitive damages.

## AS AND FOR A SECOND CAUSE OF ACTION AGAINST Fr8
## FOR BREACH OF CONTRACT (Pled in the Alternative)

54.     Plaintiffs repeat and re-allege each of the above paragraphs as if fully set forth herein in their entirety.

55.     Fr8 and Plaintiffs entered into a valid and binding agreement wherein Plaintiff would purchase utility tokens from Fr8 via the Ethereum blockchain, in a monetary amount of

10

approximately $870,000; and in consideration thereof, Fr8 would deliver said utility tokens to Plaintiffs.

56. Plaintiff performed their obligations under the parties' agreement by making the agreed upon payment.

57. Fr8 breached its obligations under the parties' agreement by failing and refusing to deliver to Plaintiffs the Fr8 utility tokens.

58. As a direct result of Fr8's breach of contract, Plaintiffs have been injured in an amount to be determined at trial, but believed to be no less than $830,000, exclusive of interest and all attorneys' fees and costs associated in prosecuting this action.

### AS AND FOR A THIRD CAUSE OF ACTION AGAINST Fr8 FOR UNJUST ENRICHMENT (Pled in the Alternative)

59. Plaintiffs repeat and re-allege each of the above paragraphs as if fully set forth herein in their entirety.

60. In the alternative to Plaintiff's securities fraud and breach of contract claims, Fr8 should be held liable on an unjust enrichment claim.

61. Plaintiffs paid Fr8, via the Ethereum blockchain, the monetary sum of approximately $830,000 for which Plaintiff received no consideration in return.

62. Despite demand, Fr8 has refused to repay Plaintiffs the amount paid.

63. Fr8 has each been enriched at Plaintiffs' expense.

64. It would be against good conscience and equity to permit Fr8 to retain the benefits of Plaintiffs' monies without reimbursement.

65. As a result of the foregoing, Plaintiffs have been damaged in an amount to be determined at trial.

### AS AND FOR A FOURTH CAUSE OF ACTION AGAINST
### MAXIMALIST, FOX AND BRAKEVILLE
### <u>FOR UNJUST ENRICHMENT</u>

66. Plaintiffs repeat and re-allege each of the above paragraphs as if fully set forth herein in their entirety.

67. Upon information and belief, monies paid by Plaintiffs in exchange for Fr8 tokens were diverted to Fox, Brakeville and Maximalist, for their own use and to the detriment of Plaintiffs.

68. Maximalist, Fox and Brakeville have each been enriched at Plaintiffs' expense.

69. It would be against good conscience and equity to permit Maximalist, Fox and Brakeville to retain the benefits of Plaintiffs' monies without reimbursement.

70. As a result of the foregoing, Plaintiffs have been damaged in an amount to be determined at trial.

### AS AND FOR A FIFTH CAUSE OF ACTION AGAINST
### Fr8, FOX AND BRAKEVILLE
### <u>FOR COMMON LAW FRAUD</u>

71. Plaintiffs repeat and re-allege each of the above paragraphs as if fully set forth herein in their entirety.

72. The aforementioned material misrepresentations and omissions contained in the January 2018 Whitepapers, on which Plaintiffs relied to their detriment, constitute fraudulent and deceptive acts and practices by Defendants Fr8, Fox and Brakeville, committed knowingly, intentionally and/or grossly negligently and with a deliberate and/or reckless indifference to making an accurate, fair, balanced and non-misleading presentation to Plaintiffs.

73. As a direct result of Defendant Fr8, Fox and Brakeville's common law fraud, Plaintiffs have been injured in an amount to be determined at trial, but believed to be no less than

$830,000, exclusive of interest and all attorneys' fees and costs associated in prosecuting this action.  As Defendants' actions were intentional and designed to deceive the Plaintiffs and the public in general, Plaintiffs respectfully request an additional award of $1,000,000 in punitive damages.

**WHEREFORE**, Plaintiffs respectfully request the relief sought herein, together with any other relief that the Court deems just and proper.

DATED:    New York, New York
          January 16, 2020

                                          THE ROTH LAW FIRM, PLLC

                                          By:    s/ Richard A. Roth
                                                  Richard A. Roth
                                                  Jordan M. Kam
                                        295 Madison Avenue, 22nd Fl.
                                        New York, New York 10017
                                        Tel: 212-542-8882
                                        Fax: 212-542-8883
                                        *Attorneys for Plaintiffs*